Good morning. My name is Anne Traum. I represent Appellant John Ringgold, and I would like to reserve time for rebuttal. I will try to keep my eye on the clock. My client claims that the motion to suppress in this case should have been granted because the officers prolonged and exceeded the scope of the traffic stop without reasonable suspicion to ask about drugs, and his consent to search was involuntary. I want to focus on the pivotal phase during the traffic stop when the officers switched gears from conducting a traffic stop to pursuing a consent to search using their special training technique. Just to set the stage, recall that one officer, Officer Dutchover, is questioning Ringgold in front of the patrol car, and the other has taken his license and registration back to the patrol car to do a records check. When the records check comes back clear, the officer in the car who's doing the records check, who now does not suspect that there's an invalid license, improper registration, that the car is stolen, he's found what he's found a domestic violence arrest, and he claims, although I find that this is incredible and clear error in the record, that he also found an arrest in Oklahoma. He then decides, I mean, he could have stopped the traffic stop right there because there's no more reason for a traffic stop. But instead he actually stays in his car two to three minutes longer to prepare a consent to search form, setting the stage for the next leg of this detention. Then he goes to the other officer, hands him back the license, and the other officer, Dutchover, says he wants to ask for consent. Dutchover then tells my client Ringgold he's not going to ticket him. He's going to let him off with a warning, doing a big favor to my client, who's eternally grateful. Dutchover then returns the license and says, we're all done here. My client takes one step towards his car and then is asked by Dutchover, can I ask you some more questions? And Dutchover says, what's wrong with that? And he says, sure. Well, at that moment he knew his sister was a police officer. She told him never to consent to anything. I mean, this is somebody who knows that he could have just said no. Well, we don't know that until later in the detention, and I want to focus. I'm just saying what in the world is wrong with a police officer saying, you know, I'm done with it all. Can I ask you a few more questions? And the guy could have said no. I'm out of here. You could have said yes. The guy could have said yes. The guy could have said no. Our contention is that at that moment, any reasonable motorist who's just been questioned by the side of the road at 10.30 at night, let off with a warning, let off with a warning, and let off with a warning, so now he has a ticket hanging over his head, which can be given, that any reasonable motorist in that situation would not have felt free to say no and walk away. The guy said he's not going to ticket him. He said, we're through. He said, we're all done here. Can I ask you some more questions? And our contention is that any reasonable motorist would have said yes, because you answer the questions until you're done answering the questions, because that's what reasonable motorists do. And at that moment, he was in a continuing detention. He was not free to leave. And furthermore, at this moment, the officers have already prolonged and exceeded the scope of the detention, and we maintain that they did that without reasonable suspicion. Well, at that point, the officer knows that he's got an overwhelming air freshener in the car. He's driving he's from Pennsylvania. He's driving a car that's registered to somebody else from Missouri. He's given a cockeyed story about going to, going past Las Vegas to State Line to get a burger king, a hamburger at Burger King. He's got stuff all over the car, which doesn't comport with, with why he was going to Las Vegas. What's, what's wrong with the officer at that point using all of that information, saying can I ask you some more questions? He's got reasonable suspicion to think that something other than what, what the, what your client said is true. Well, I just want to be clear about sort of where I'm going in the analysis, just to, and then I will respond to some of the points that you've made. One is that if he has reasonable suspicion, I understand the court's point. It doesn't matter what happens before he asks the ultimate question if he's authorized based on his reasonable suspicion to ask that question. So, and I will, I mean, I agree that if there's reasonable suspicion to ask the question, he can ask it. Do you have the drugs in your car? If he doesn't have reasonable suspicion, the consent is out. If he does have reasonable suspicion, we next go to whether the consent is valid. So having said that, I just want to spend a second on the reasonable suspicion that his, you know, most of the factors, the 15 factors that the officer has cited and the court relied on, the court actually sort of puts emphasis on four. Well, you're using four of them, and there's a fifth I forgot to mention, which is that the airbag on the passenger side is off-kilter with the consent. So that's five factors that are kind of peculiar. Right. The court doesn't particularly do the court actually doesn't rely on that factor. It relies on nervousness, the smell of a. Okay. The smell of a single air freshener, which is distinguishable from the case in Barron where there was also a smell, but there was no known source of the smell. A single air freshener is what you can get at any car wash when you go there. They put it in your car. It stinks up your car, and it only takes one. We all know that. Then there's this nervousness, several factors of nervousness. Then he has a story which the officer says is suspicious, but we actually don't know in this case, unlike we knew in other cases, that it was such a short trip. We don't know when he started. All we know is he's staying for one day and returning. In other cases, it's suspicious when you don't have anything in your car. Here it's suspicious when you do have something in your car that actually matches the explanation that you've given. So then he's asked, you know, what's the name of the casino at State Line that you went to? That's a question that's sort of beyond the scope of the questioning. So right there you have a suspicious answer, but the suspicious answer is in response to a question that's beyond the scope of a traffic stop. That the officer himself conceded had nothing to do with the purpose of the stop. So those are some of the problems which I've noted in the brief with the reasonable suspicion. But let's go on to the consent, because maybe that's where your concern is more. And so here we have early, early on in the stop setting the stage for that consent. Prolonging the detention in order to effectuate that consent based on their training technique, which is they do it, they have it in hand, before they even know that this person is going to stick around to answer more questions. Fine. But what happens after that is that the officers persist in asking him for consent. My client says in five different ways, everything but no. Now, I concede that he doesn't say no, and he could have said no. But he also says everything but no. And that's a hard situation to be in. And I think that even if the court were to find that he was free to leave when he was asked the question, will you answer more questions, that as these, this questioning goes on and on, and they're having this repartee about, you know, do you want to, why do you want to search? Can you look and not search? No, I want to search. Can I take my belongings out of the car? No, I want to search in the car. That at that point, during that conversation, he's no longer free to leave. Because here he's sort of trying to demur the question, and he's not being successful. And at that point, it just sort of escalates. And he doesn't give in until when? Until the officer tells him that he's going to have a dog search. And the government's brief actually says this, quote, that Dutchover decided to have the narcotics dog walk around the car because Ringgold continued to be indecisive. The officer described my client as hem-hawing and stonewalling. If that's not no, if stonewalling isn't no to a regular citizen who is supposedly free to leave, then I don't know what is, because it is hard to say no to a police officer. And this is as close to no as I've ever seen in a consent case. Then he says I'm going to have the dog do a free air sniff. I'm not sure how a citizen is supposed to know what that means, but that's what makes it so. That's what makes him relent. I think that persistence, that prolonging is what overwhelmed my client to give the consent. I'll reserve the balance of my time. Thank you. Thank you. Good morning. My name is Patrick Walsh. I'm an assistant United States attorney for the District of Nevada. And I'm arguing on behalf of Plaintiff Appelli of the United States of America. The lower court correctly denied Mr. Ringgold's motion to suppress. The factual findings made by the lower court were not clearly erroneous. And there was reasonable suspicion to believe that Mr. Ringgold was engaged in narcotics trafficking. The trooper, Ringgold, also voluntarily consented to the search. And while he consented, it was during a consensual encounter, because he had been told, we're all done here, on two occasions.     He'd been issued a warning. He'd been issued a warning. He'd been issued a warning. And he actually acknowledged that he knew they were done by thanking the officer and turning and starting to walk back to the car. The officer reinitiated his contact in the way prescribed by Mendenhall, by approaching him. Well, actually, the officer didn't approach him, but asking him, can I ask you some questions? He responded affirmatively, and Ringgold came back to the officer. That's when the consensual encounter occurred.     in narcotics trafficking. The factual findings made by the lower court were not clearly erroneous. It was properly found, and it was not clearly erroneous for him to do so, that at that time, the officers knew that Mr. Ringgold had been stopped six months prior with a secret compartment in a truck with $660,000 of cash. That's clearly a suggestion that he's involved in criminal activity. The trooper also saw the passenger-side airbag look suspicious, as if it had been tampered with. And in fact, later results showed it had a secret compartment in it.     I'm sorry, I'm sorry. I'm sorry, I'm sorry. The trooper, at the time he saw that, had stopped cars previously that had a secret compartment in that airbag. Those two factors alone justify reasonable suspicion. But the trooper here had more. Mr. Ringgold was nervous. Mr. Ringgold had a crazy story. And again, based on the trooper and the lower court's knowledge of the area of Las Vegas, it seems ridiculous for someone to come all the way from Missouri to come purportedly to Las Vegas to help his niece move   He's a very good driver. He's a very good driver. He's a very good driver. The trooper drove past Las Vegas 40 miles after making such a long trip to get something to eat at a Burger King. And in fact, Mr. Ringgold said the casino he went to visit, who he couldn't remember the name, even though he went so far out of his way to get there, was closed. Another fact that the trooper would know is really suspicious because casinos never close. Based on all the 15 factors, plus the $600,000, the trooper did have   I'm sorry, I'm sorry. I'm sorry. I'm sorry. I'm sorry. possible that the trooper's route was also voluntary, and the lower court was not clearly erroneous in finding so. Here, Mr. Ringgold did ask a lot of questions about the consent. But just like in Soriano, that went to show he understood what he was doing. The lower court found that it was not coercive and the transcript kind of gives, I believe, this Court a view of what the testimony of Trooper Dutchover was like. He used terms like hem-hawing and stonewalling. And even how he described his first initiation of the conversation was, hi, my name's Trooper Dutchover. I pulled you over because you were speeding and because your rear license plate light was out. The conversation was described as nothing but conversational, not authoritative. He used the word casual. The trooper asked for permission to search the car. The Mr. Ringgold responded, not with force. Not with a no, but with a limited yes. You can look into the car. The trooper explained the scope of the search he wanted. Not just to look. He was actually wanting to search. Again, the Ringgold responded with a question. On a prior occasion, my car had been damaged by police who were searching it. This isn't a no. This is a concern.  Again, the Mr. Ringgold responded with a yes. I would respect your property. The Mr. Ringgold responded, my sister told me never to consent to a search of the car. That has two facts that are important. One, it was not a no. He was relaying advice from his sister. He didn't say, so I'm saying no. Second, it shows that this person, Mr. Ringgold, knew he had the right to say no because his sister, a cop, told him so. Finally, the officer, because he wasn't sure whether Mr. Ringgold was going to make up his mind at all, signaled to do a free air sniff, which he was entitled to do, both based on Todd Hunter, based on the recent Supreme Court case in Illinois versus Cabayas. The words he used, I'm going to have a dog conduct a free air sniff. It was only at that point that Ringgold said yes. The lower court admitted that that was somewhat concerning. But here, the trooper right away then wanted to make sure that he understood he had a right to say no. Trooper Dutchover said, you have a Fourth Amendment right to say no. Trooper Dutchover provided him with a written consent to search form that says you have a right to refuse. And even after the search started, but before the drugs were found, Detective Sanford again reminded him when Mr. Ringgold came up to Detective Sanford and said, if I told you you couldn't search, would you have done it anyways? Detective Sanford said, Trooper Dutchover told you you could say now. And again, because he had another equivocal statement here, Detective Sanford asked him again, are you giving us consent to search the car? And he said yes. If the panel has no further questions, I'll submit the rest of my time. I don't think so. Thank you. Thank you. I just want to make a few points in terms of the consent to search. One is that there are no magic words in the Fourth Amendment. It's a totality of the circumstances test. So saying we're all done here doesn't mean that it was a consensual encounter as the government maintains that it does. Under the totality of the circumstances, it's not clear to me that even saying no is required by the defendant. The test is whether his consent was voluntary. Now, on Cabayas, Cabayas, the new Supreme Court case saying that a dodge search is not a search, that's not a consent to search case. And we know from prior cases, there's a case called Pruitt which was cited in my brief. There's also a case called Salzano from the Tenth Circuit that was cited by the court in Chavez Valenzuela that enlisting the help of a dog search is a code for when there is a refusal. So that may be tantamount in this situation, which is how it played out here, that when you have a refusal, you get the help of the dog to break the will of the defendant. They overwhelmed his will in this case not to search. And that's why we think it's invalid to say, to give his consent. And that's why we think it's invalid. Thank you. Thank you, counsel. The matter just argued to be submitted. And we'll next hear argument in Nationwide Mutual. Thank you, counsel.
judges: Noonan, Thompson, Rymer